IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION
CASE NO. 1:17-CR-00987-JMC

UNITED STATES OF AMERICA,                    DECEMBER 7, 2018
                                             10:07 A.M.
                    Plaintiff,


        vs.


DOUGLAS WADE WILLIAMSON,

                    Defendant.        PAGES 1 THROUGH 80
_____

                  TRANSCRIPT OF SENTENCING
          BEFORE THE HONORABLE J. MICHELLE CHILDS
                UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:    Mr. James H. May, AUSA
                      OFFICE OF U.S. ATTORNEY
                      1441 Main Street
                      Suite 500
                      Columbia, SC 29201


FOR THE DEFENDANT:    Mr. James M. Ervin, Esq.
                      ERVIN & McGUIRE LAW FIRM
                      1824 Bull Street
                      Columbia, SC 29201


STENOGRAPHICALLY      Ms. Carly L. Horenkamp, RDR, CRR, CRC
REPORTED BY:          Official Court Reporter
                      U.S. DISTRICT COURT
                      901 Richland Street
                      Columbia, SC 29201
                      954.557.5504

# I N D E X

*Certificate* ----------------------------------------------- 80

## W I T N E S S

ON BEHALF OF THE GOVERNMENT:                              PAGE
RONALD GROSSE
DIRECT EXAMINATION BY MR. MAY                               41
CROSS-EXAMINATION BY MR. ERVIN                             58

1          (Open Court, 10:07 a.m.)

 2               THE COURT:  Good morning.  Thank you all.  Please take

 3      your seats.

 4               Government, please call your case.

 5               MR. MAY:  Your Honor, this is United States of America

 6      versus Douglas Wade Williamson.  It's Criminal No. 1:17-987.

 7      We're here for a sentencing.  The presentence report has been

 8      prepared.  The government has no objections.  Mr. Williamson

 9      lodged several objections.  My understanding is that they are

10      all being withdrawn.  I will be happy to address one of them.

11      The government's happy to try to come to a resolution in this

12      matter.

13               THE COURT:  Okay.

14               MR. MAY:  The defendant objected to the actual loss

15      amount.  The loss amount in the presentence report was between

16      9.5 and $25 million, and had we gone forward today with

17      testimony, we had retired Special Agent Ron Grosse to testify,

18      and he was going to testify to the most abundantly apparent

19      fraudulent applications, and they were from various people to

20      include John Fitzgerald Carroll, Mary Cat Carroll, Courtney

21      Carroll, as well as a whole host of mortgages -- mortgage-based

22      life insurance -- life insurance that was based upon mortgages.

23      Special Agent Grosse quickly went through and found

24      approximately $9.5 million worth of policies so we could hit

25      that threshold.

10:07    1          But in discussions with defense counsel and to make

2    this more efficient, and in the understanding that this does

3    not affect the guidelines, while the government recognizes that

4    Note 3(C) states that loss is an estimation, we are agreeing to

5    the defense that we could prove up 9.5, but we will be happy to

6    just go 3 million to 9.5 million.  Again, it does not affect

7    the guideline calculation.  It just moves him from, after

8    acceptance of responsibility, of level 27, it moves it to a 25,

9    criminal history II, which puts him at a zone of 63 to 78

10   months.

11         The statutory max for this count is 60 months, so it

12   just renormalizes, I believe, to the next level or the next

13   lowest one, which would be 51 to 60 months.

14         So we are conceding on that.  So when the Court

15   recalculates the guidelines, the Court should recalculate the

16   guidelines as a criminal history II, offense level 25, after

17   acceptance of responsibility, which again would put him between

18   63 and 78 months, but when you have to renormalize it because

19   of the statutory max, it would put him at the next level, which

20   would be approximately -- I would defer to probation as far as

21   what it exactly puts him at, but it has to recalculate because

22   it was over the statutory max.

23         My understanding is outside of that concession by the

24   government, the defendant is withdrawing the rest of his

25   objections, and then I believe both parties are prepared to go

10:09  1    forward on the sentencing today.

2            THE COURT:  Okay.  And then let's hear from defense

3    counsel, your position on those issues.

4            MR. ERVIN:  Thank you, Judge.  That is true.  We,

5    after discussing with the government the objections, well, we

6    found reasonable bases for the guideline calculations.  As

7    opposed to objections, we will have more of a mitigating

8    argument and we'll pray the Court consider alternative means of

9    calculating loss.

10           THE COURT:  Okay.  And probation, if you'd go ahead

11   and state, under that agreement, the total offense level 25,

12   criminal history category II, what the new range would be.

13           PROBATION OFFICER:  The new range would be 63 months

14   to 78 months.  It does not change the guideline range because

15   the statutory max is 60 months and that is the guideline range.

16           THE COURT:  Okay.  Thank you.

17           Okay.  So I'm going to ask Mr. Williamson to stand up

18   and be sworn, please.

19           COURTROOM DEPUTY:  Please raise your right hand to be

20   sworn.

21           DOUGLAS WADE WILLIAMSON, DEFENDANT, SWORN

22           THE COURT:  Okay.  All right.  Mr. Williamson --

23           THE DEFENDANT:  Yes, ma'am.

24           THE COURT:  -- have you had the opportunity to go over

25   your presentence investigation report with your attorney?

10:10  1          THE DEFENDANT:  Yes, I have.

       2          THE COURT:  And you did hear that your attorney had

       3    filed factual and legal objections on your behalf, but those

       4    are now withdrawn pursuant to the agreement by the government

       5    to cap your loss at 9.5 million.

       6          THE DEFENDANT:  Excuse me.

       7          THE COURT:  Sure.

       8        (Off-the-record discussion between Mr. Ervin and the

       9    defendant.)

      10          THE DEFENDANT:  Yes.

      11          THE COURT:  Okay.  All right.  So you understand that

      12    you pled guilty to Count 1 of the indictment, which is

      13    conspiracy to commit mail and wire fraud?

      14          THE DEFENDANT:  Yes.

      15          THE COURT:  And you did so pursuant to the terms of a

      16    written plea agreement?

      17          THE DEFENDANT:  I'm sorry?

      18          THE COURT:  You did so pursuant to the terms of a

      19    written plea agreement?

      20          THE DEFENDANT:  Yes.

      21          THE COURT:  Okay.  All right.  And the Court adopts

      22    that plea agreement.  For your base offense level, and now that

      23    your loss will be capped at 9.5 million, so over 3 point

      24    million to 9.5 million, you'll have a base offense level of 25.

      25          THE DEFENDANT:  Okay.  Excuse me.  What's the 25 at?

10:12   1        (Off-the-record discussion between Mr. Ervin and the

2      defendant.)

3            THE DEFENDANT:  Yes.

4            THE COURT:  Okay.  And then an additional two levels

5      would be added because you abused a position of public or

6      private trust or used a special skill in a manner that

7      significantly facilitated the commission or concealment of the

8      offense.

9            THE DEFENDANT:  Yes.

10           THE COURT:  And then an additional two levels added

11     also for you willfully obstructing or impeding, or attempting

12     to obstruct or impede, the administration of justice during the

13     course of the investigation, prosecution, or sentencing for the

14     instant offense of conviction and the obstructive conduct

15     related to your offense of conviction.

16           THE DEFENDANT:  Excuse me.

17        (Off-the-record discussion between Mr. Ervin and the

18     defendant.)

19           THE DEFENDANT:  Yes, ma'am, yes.

20           THE COURT:  Okay.  And then so that gives you an

21     adjusted offense level of, adding the 25 plus 2 plus 2, to 29.

22     Then you got two levels of credit for accepting responsibility,

23     an additional level for entering a timely guilty plea, for a

24     total offense level of the 26.

25           MR. MAY:  Your Honor, I believe that he pled guilty to

10:14    1    a 371, which has a base offense level of 6.

2              THE COURT:  Okay.

3              MR. MAY:  And then when we add the --

4              THE COURT:  Oh, I see, yes, correct.

5              MR. MAY:  So I think we start at a 28 after the

6    concession by the government and reduce it down three between

7    the timeliness and the acceptance of responsibility to get it

8    to a 25.

9              THE COURT:  25, that's correct.

10             MR. ERVIN:  That's correct, Judge.  Thank you.

11             THE COURT:  Okay.  Thank you.

12             THE DEFENDANT:  Yes.

13             THE COURT:  I forgot about that base offense level.

14    Okay.  So you're at a total offense level of 25 after getting

15    credit for acceptance of responsibility and entering a timely

16    guilty plea.

17             THE DEFENDANT:  Yes, ma'am, yes.

18             THE COURT:  Okay.  All right.  And then with that

19    total offense level now at 25, criminal history category of II,

20    still not eligible for probation, it falls in Zone D which

21    requires a period of incarceration, as indicated by the

22    probation office, that sentencing guideline range would

23    recommend a sentence of 63 to 78 months, but 60 months'

24    imprisonment is the statutory maximum.

25             THE DEFENDANT:  I understand, yes.

10:15    1        THE COURT:  Okay.  Followed by one to three years of

2    supervised release, no fine being calculated due to your

3    inability to pay a fine, and then what is the status of the

4    restitution?

5        MR. MAY:  Your Honor, I'd ask for 30 days because

6    a lot of this, as the Court knows, some of these policies have

7    been paid out, some of the policies have not.  I'd ask for 30

8    days.  We will send a query to the insurance companies and see

9    if anybody returns anything.

10        THE COURT:  Okay.  Thank you.

11        MR. ERVIN:  Your Honor, I'd just, I haven't seen any

12    calculation of restitution, and knowing that this is corporate

13    insurance companies, I think that at this point it's

14    speculative and arbitrary what restitution would be, but we'll

15    certainly defer to their information.

16        THE COURT:  Okay.  Thank you.

17        And then as with all defendants, you would have a $100

18    special assessment fee.

19        MR. ERVIN:  That's correct, Judge.

20        THE COURT:  Do you understand?

21    (Off-the-record discussion between the defendant and

22    Mr. Ervin.)

23        THE DEFENDANT:  Yes.

24        THE COURT:  Okay.  All right.  The government will

25    then talk to the Court about the sentencing factors and then

10:16    1    we'll hear from you and your attorney.  So you can have a seat

2    for now.  Thank you.

3         MR. MAY:  Your Honor, the Court is well aware of the

4    general scheme of this conspiracy/enterprise that the defendant

5    was a part of.  Now, the defendant was not the traditional

6    member of the Traveler community.  He was one of the insurance

7    agents that came in and facilitated the widespread life

8    insurance fraud that the Court has seen time and time again.

9         Mr. Williamson, along with other defendants who are

10   before the Court as insurance agents, helped facilitate the

11   fraud by doing numerous things, and as we would have proved up

12   and as probation lays out in the presentence report, they

13   falsified insurable interest, they would provide false

14   information as far as work history, net worth, income, as well

15   as health.

16        Your Honor, the nature and circumstances of this

17   crime, the pervasiveness and the widespreadness, is something

18   that, again, I don't think that this kind of insurance fraud in

19   such a confined community has been seen before in the District

20   of South Carolina.

21        While Mr. Williamson is not the one who came up with

22   this idea, Mr. Williamson did go there oftentimes.  I believe

23   the probation report said that he had submitted over 400

24   applications for various life insurance companies.  And he as

25   well as Mr. New and others really stand out because the average

10:17  1    amount of time between when the application was submitted and

2    time of death of the insured was approximately 4.2 to 4.3

3    years.  This was a concentrated effort by the Travelers to

4    insure the sickest, most feeble of the community, and they

5    couldn't do it without Mr. Williamson and other agents who were

6    willing to do this.  So I believe the nature and circumstances

7    of the crime does dictate a guideline sentence.

8         This was long spread, so there is obvious disrespect

9    for the law.  The longitudinal -- the length of the fraud, as

10    well as Mr. Williamson came and testified in front of a grand

11    jury, and as the presentence report notes, he was not truthful

12    to the grand jury, that would dictate again to a guideline

13    sentence for the lack of respect.

14         Your Honor, I think that the one thing that is

15    interesting with Mr. Williamson and the other life insurance

16    agents is to ensure there is not a disproportionate sentence.

17    While the fraud could not have happened but for them, they were

18    not the ones who were -- he made a living doing it.  He did not

19    get wealthy doing it.

20         The Court has sentenced other people.  I'd point the

21    Court to Hannah Carroll.  Hannah Carroll, whose loss was over

22    3.5 million, got wealthy with insurance fraud.

23         He did have a living.  His living was based upon

24    insurance fraud.  However, it is not to the extent of some of

25    the other Travelers who, for lack of a better term, picked the

10:19   1    right person to insure and who died in a very, you know, quick

2    manner.

3            So I think that's the one thing that I'd give to the

4    Court as possible -- I'm not sure that dictates the guideline

5    sentence considering where everybody else has fallen, because

6    just as we talked, I guess it was on Tuesday, about the

7    disproportionate sentences and how the guidelines can be looked

8    at either with loss amount driving the guidelines, but also the

9    length and the pervasiveness of the fraud, well, we have both

10   here.  However, his guideline calculation is going to be higher

11   than anybody else besides another life insurance agent, but

12   he's not making -- he's not getting wealthy on this, as many of

13   his codefendants were.  So I'd point that out to the Court to

14   just kind of give that consideration.  I believe that would

15   be -- weighs in his favor.

16           THE COURT:  Okay.  I was about to say, are you talking

17   yourself out of a sentence by making those comments?

18           MR. MAY:  No, I'm just providing -- the Court asked me

19   to give the 3553(a) factors --

20           THE COURT:  Right, okay.

21           MR. MAY:  -- so I'm trying to provide all the

22   information to the Court so that way the Court can make the

23   correct judgment.

24           THE COURT:  Okay.

25           MR. MAY:  The correct determination.  I think that's

10:20   1   the one guideline factor that weighs in his favor.  I think the

2   other ones, including ensuring that other life insurance agents

3   do not go back and do this, right?  The deterrence factor would

4   weigh into a guideline sentence.  So I think when the Court is

5   weighing this, I'd ask the Court have a colloquy with him

6   regarding kind of educational rehabilitative requirements of

7   him.  I don't know of any, so I can't speak to that.  But when

8   we look at the 3553(a) factors, as the Court has asked me to, I

9   believe that most of them weigh into a guideline sentence,

10   though I think there is something on the other side saying that

11   he has to be punished more harsh because he dealt with a lot of

12   people than are the folks who did get wealthy by dealing with

13   him.  So the government still believes the guideline sentence

14   is appropriate.  However, in weighing them, there is one thing

15   that weighs in his factor.  I believe the rest of them weigh in

16   the factor of a guideline sentence.  I'm happy to answer any

17   questions the Court may have.

18          THE COURT:  Would you suggest that he and Mr. Leonard

19   New were the ones who were the insiders, so to speak, insofar

20   as all the Travelers were concerned?

21          MR. MAY:  I think that they are two of the

22   approximately four life insurance agents who are the most

23   prevalent.  You have, in another case, another life insurance

24   agent, Mr. Mercier.  His father, I believe, is the one that an

25   investigation has found is the one who really instituted what

10:22    1    they called the life insurance scam.  Mr. Mercier, Sr., his

2    name is Tony Mercier, passed away approximately 12 months ago,

3    18 months ago, but he passed away before the second round of

4    the pleas that came out.  He was a person that was being looked

5    at.  But Mr. Williamson, Mr. New, Mr. Mercier, and then

6    Mr. Mercier's son, Charles or Chuck Mercier, who is indicted in

7    another case, were four of the most prevalent folks out there

8    who were the agents who -- and I think Special Agent Grosse

9    found approximately 5,000 different applications for life

10    insurance policies.  He's not as prevalent as Mr. New, but I

11    believe he was second-most, and we see that the majority of the

12    ones at least that we examined were fraudulent or had some sort

13    of fraud.  We were prepared today to prove up approximately 60

14    of them, but because of the concessions, we withdrew them.  We

15    would stand by where we are because in the big scheme of things

16    it doesn't affect the guideline calculation.

17              THE COURT:  Thank you.

18              MR. MAY:  Yes, ma'am.

19              THE COURT:  All right.  Counsel?

20              MR. ERVIN:  Thank you, Your Honor.  Judge,

21    Mr. Williamson is here, and if you look at the presentence

22    report it shows that he has no substantial criminal history.

23    The one mark that he has is a DUI from 2007.  And as Your Honor

24    is familiar with, and I know Mr. May used to do criminal

25    defense and I've done quite a bit of it, DUI's not related to

10:23    1    this white collar insurance fraud crime, it's simply a moving
         2    violation, for lack of a better term.  I'd like for you to
         3    consider but for that his lack of a criminal history or
         4    criminal activity.
         5         Mr. Williamson, he is currently 55 years old and he's
         6    married.  His wife and his brother are here in the courtroom
         7    today in support of him and they -- if Your Honor wanted to
         8    hear from them, they could speak to his veracity and
         9    credibility.
        10         In this case, the main scheme and origin of all
        11    fraudulent information was from the applicants themselves.  As
        12    an insurance agent, he is a procurer of policies and his job is
        13    to create a steady stream of policies that go to the insurance
        14    company and are further scrutinized by an underwriting process.
        15    So in many of the applications, his certification actually says
        16    that he is representing the information given to him by the
        17    applicant.  So really, his culpability and the criminality of
        18    his actions is something I'd like for you to consider namely
        19    when coming up with calculating loss.
        20         And the Guidelines Section 2B1.1(b)(1) and its notes
        21    show that there are alternative ways to consider loss.  To take
        22    a cumulative figure with regards to every insurance policy that
        23    may have fraudulent information on it we feel strongly
        24    overstates the defendant's actions and his culpability in this
        25    case.

10:25    1          Furthermore, we don't have a firm number as to how
2    many of these policies were actually granted, how many lapsed,
3    how many failed to be continually premiums paid and honored, so
4    therefore that gross number, "gross" meaning cumulative, is
5    again overstated.
6          THE COURT:  So you're saying even with the agreement
7    of the 9.5 million cap, where it was originally up to
8    25 million, that that still is grossly overstated?
9          MR. ERVIN:  Your Honor, I understand the basis for the
10    calculation of intended loss, and that being a cumulative
11    number of all the policies.  What I'm asking you to consider is
12    the alternative, and the guidelines actually direct that there
13    is an alternative way to look at this.  And when you consider
14    the actual victims being a corporate entity that had safeguards
15    in place, such as underwriters and other people to scrutinize
16    these applications, I think it greatly diminishes my client's
17    culpability and criminality in his actions.  That being said,
18    we understand that those policies are worth X amount of dollars
19    and we're not arguing with that.
20          THE COURT:  Okay.  But help me out with the fact that
21    under that scenario, if he is only receiving information and
22    then turning it over, what's the criminal intent?
23          MR. ERVIN:  Your Honor, he sells life insurance
24    policies.
25          THE COURT:  Right.

10:26   1        MR. ERVIN:  In this case, he gets a commission that's
        2   typically around a one-year premium.  So in a case of -- in
        3   many of these cases, his commission would be anywhere from $400
        4   a year to a thousand dollars a year.  In most cases it's under
        5   a thousand dollars.
        6        What I'm getting at is, the applications ultimately
        7   involved fraudulent intent from the applicant, and then he's
        8   here to take responsibility for occasions that he presented
        9   information that he may have known not to be completely
       10   accurate, okay?
       11        But with regards to intended loss --
       12        THE COURT:  But they're not here on an application
       13   that was one time or another, you know, very few times if at
       14   most that kind of got passed on where he turned the other way.
       15   They are here because they are alleging that he committed
       16   substantial fraud in knowing the community, knowing that the
       17   wives didn't work, knowing that they were particularly targeted
       18   at individuals who would have essentially a short life span,
       19   and that they would immediately profit and not even be eligible
       20   for the amount of insurance for which they applied.
       21        MR. ERVIN:  That is a -- and with all due respect to
       22   the prosecution, that is a general umbrella of all the schemes
       23   and different capacities that the applicants would present.
       24        MR. MAY:  Your Honor?
       25        THE COURT:  Yes.

10:28  1          MR. MAY:  May I just speak to him for one second to

2    make sure he doesn't go down the wrong path?

3          THE COURT:  Okay.

4          MR. ERVIN:  Sure.

5      (Off-the-record discussion between Mr. May and Mr. Ervin.)

6          MR. ERVIN:  Your Honor, and I certainly appreciate the

7    candor of opposing counsel and your questioning.  We're not

8    here to shirk responsibility for these actions.  He did

9    knowingly present fraudulent information on insurance

10   applications.  What I'm addressing is the vastness of the

11   people coming to him and applying.

12         THE COURT:  I'm not suggesting that the other persons

13   who are applying aren't also committing the fraud.  That's not

14   what I'm saying.  They've been before Court, they took their

15   responsibility and they've gotten their sentences, or will.

16         What we're here about is him knowingly receiving the

17   information, turning a blind eye to it, and doing it in a

18   substantial manner, because we're not talking two, three

19   applications, we're talking several hundred, potentially.

20         MR. ERVIN:  Correct, Your Honor.  And we agreed to the

21   cap based on reducing that number from several hundred to

22   around 30 to 60.

23         THE COURT:  Okay.

24         MR. ERVIN:  That's where that discussion came from.

25   And I'll defer to opposing counsel, but that's what I want to

10:29  1    point out to Your Honor --

2            THE COURT:  Okay.

3            MR. ERVIN:  -- is the agreement to withdraw the

4    objection with regards to loss calculation was that we're

5    limiting the scope to a certain type of fraud, in this case

6    being mortgage fraud.  These -- well, and I'll just say without

7    the applicants and without him the scheme doesn't work, so

8    they're both actors and he's here to accept responsibility.

9            But if I may go in another direction, Judge, because I

10   don't want to flirt with him not accepting responsibility, he

11   certainly is here to do that today, but regarding loss, again,

12   the intended loss is vastly different from what the actual loss

13   or the actual gain that he got was, and in this case,

14   calculating actual gain to the defendant would be

15   roughly $40,000 if you consider the commissions he made and

16   kept and took home with him, as opposed to 3.5 to $9.5 million

17   of policy limits that may or may not have been delivered to the

18   applicants -- or beneficiaries, rather.

19           And I ask you to consider that because of the vast

20   difference in those numbers and the way, even if applied to the

21   guidelines, I think that it's not unreasonable to consider a

22   variance and to deviate from the guidelines when considering a

23   sentence today.

24           Again, the -- Mr. Williamson allowing these

25   applications to go to underwriting, knowing that there's

10:31    1    fraudulent information in these applications, there's also the

2    knowledge that the underwriter may get wise to that and the

3    application doesn't make it through the screen, you know, so in

4    other words, it's not him taking the application saying, this

5    is guaranteed to pay out a quarter of a million dollars

6    regardless of his knowledge of the fraudulent information on

7    that, he also has knowledge that there are other gatekeepers

8    within the insurance company that could prevent that loss from

9    actually happening.  So it's -- it becomes a little gray

10   whether or not the actual loss can be considered the

11   beneficiary amount on the application versus what actually was

12   granted, paid for, and realized.  So I think that can be

13   considered to greatly diminish the loss calculation.

14        And I think what that goes to, Your Honor, is his

15   intent and reasonable expectation at the time of the fraud as

16   to what the loss would be.  He did, and he's here to admit to

17   allowing this fraudulent information on the application going

18   forward, but again, whether or not he reasonably expected that

19   fraudulent act to result in a loss is also to be considered

20   because, again, he's got an underwriter above him that's going

21   to screen it further.  Whether or not that happened is, at that

22   point, out of his hands.

23        THE COURT:  So are you suggesting that he was just

24   satisfied with getting his commission and then would be hopeful

25   that the underwriter would catch it, but he'd still just keep

10:32  1   his commission?

2   MR. ERVIN:  Maybe in one or two circumstances, yes,

3   ma'am, that's absolutely what we're saying.  I mean, it's

4   axiomatic to say that this fraudulent information came from an

5   applicant and his job is to go in there and get that

6   information.  Now, if he's sitting there in these houses

7   knowing that, well, this house isn't worth what you're telling

8   me your mortgage is, he may know that, but again, this person's

9   giving him that information.  He's sending it on.

10   The -- if I may approach, Your Honor, I've got one

11   example -- or several examples to show you about the kind of

12   houses that he would sit in and watch these people fill out

13   these applications.  If Your Honor would like, I'd like to

14   approach.

15   THE COURT:  Okay.

16   MR. ERVIN:  And I've given a copy to opposing counsel.

17   This is really just a stack of photographs of the houses and

18   residences that Mr. Williamson would visit when getting these

19   applications filled out.  These folks would invite him into

20   their homes, he would sit in the front room or a breakfast

21   table and go through the application process, and if the

22   application is based on a mortgage and they're telling him they

23   have a mortgage, they're sitting in a house that may appear to

24   be eligible for that size of a mortgage.  Now, what ultimately

25   resulted is these mortgages didn't exist on some of these

10:34   1    houses and these people didn't actually have ownership of those

2    homes.

3            Again, he's not saying, you know, he turned a blind --

4    he's not saying he had no idea that they would be presenting

5    fraudulent information, but certainly the scheme, these people

6    were very savvy in presenting a plausible scheme that would

7    result in an ease -- an easier way for Mr. Williamson to fall

8    into the trap of breaking the law and submitting these

9    fraudulent applications.

10           Again, I think his criminality and the culpability

11   should be considered when you're looking at people that are

12   presenting a scheme like this, and I think it weighs into a

13   reasonable deviation from the guidelines and a variance to go

14   substantially lower than where he sits on this table.

15           THE COURT:  One of my other questions would be, given

16   the government's representation that the policies would pay out

17   from the time of the application until death at about 3.2 to

18   4 years, perhaps up to 5 years, was he in that scheme long

19   enough where those applications started paying out and then he

20   was still writing more?

21           MR. ERVIN:  Your Honor, at that point as an agent,

22   that's beyond his scope of duties, so I'm not sure that he was

23   aware of a policy paying out and a celebration of someone

24   getting rich off of that.  That certainly wasn't his duty or

25   goal.

10:35    1          Again, his job was to create a steady stream of policy

2    applications, and this community, you know, presented that to

3    him and it resulted in what later would be -- seem obvious,

4    fraudulent, you know, applications and information on those

5    applications.  But again, I don't believe that he would have

6    had knowledge or actual knowledge of any policy paying out and

7    celebrating to that fact and going to get more for these

8    people, that sort of thing.

9          That being said, it is true that these folks at some

10    point were seeking him out more so than any other group because

11    he was able to procure policies for them, and maybe that's the

12    reason, because they were paying out.

13          But at one point, and if we had gotten into the facts,

14    there were several instances where he simply wouldn't take

15    their call, would turn them down because they were just being

16    too aggressive and it was obvious that they were trying to

17    propel the scheme even further.

18          So, Judge, I think based on the obvious criminality of

19    the Irish Travelers in that community being able to present

20    plausible -- plausible facts and allegations that were

21    ultimately fraudulent, they made the ease of his falling into

22    this scheme much more -- much more obvious.  And he -- he's

23    here to take responsibility, Judge, but I believe, and I want

24    to cite a case, it's from the Eleventh Circuit, *U.S. v.*

25    *Livesay*, that a probational sentence well below the guidelines

10:37    1    was upheld as reasonable based on his criminality and the fact

2    that the guidelines and loss calculation greatly overstated his

3    involvement and criminality in the case.

4        And I think we have that here.  I understand that the

5    numbers are up there when you take in the cumulative loss

6    calculation, but the guidelines do allow Your Honor and the

7    Court to take an alternative view and an alternative

8    calculation.  And again, considering his actual gain, you're

9    talking about $40,000, give or take, versus considering 3.5 to

10    $9.5 million.

11        THE COURT:  Wouldn't that be a better argument if I

12    had, for example, a tax scheme where the person assisted

13    somebody filling out a lot of fraudulent applications, then

14    they go to a hub, let's say, in Dallas, and the IRS gets wind

15    of it and then never allows those to get into the system?  That

16    the people who actually filled them out with the tax preparer,

17    or even if the tax preparer filled them out for the people,

18    those people never netted anything, so they basically got

19    stopped and that's it, and at most that person got maybe $50 on

20    the return or something like that?

21        MR. ERVIN:  There's no question that -- I don't

22    present myself as a tax expert --

23        THE COURT:  Sure.

24        MR. ERVIN:  -- but I will say this.  In that scheme,

25    Your Honor, that's almost akin to what we have going on here.

10:38  1          THE COURT:  But we have payouts here in some

2      instances.

3          MR. ERVIN:  You do have payouts, but Judge, that's not

4      something that he propelled the payout.  Of course, he was --

5      like the IRS, he's sending it to another screening level.

6      Another underwriter is looking at this stuff.

7          THE COURT:  But if you're part of that scheme and then

8      it actually makes its way through, that's one scenario, but I

9      think that when it never made it there, then of course you can

10     have an anomaly in the actual loss versus the intended loss.

11         MR. ERVIN:  I'll say this, and I'll tread lightly, but

12     I believe IRS schemes have paid out in the past to some people

13     who have actually gained from those.

14         THE COURT:  Well, they have, but I'm describing a

15     scenario in which it hasn't --

16         MR. ERVIN:  Yes, ma'am.

17         THE COURT:  -- and that the initial tax person just

18     got maybe the modest $50 to $80 per return, but the taxpayer

19     never got the return.

20         MR. ERVIN:  Right.

21         THE COURT:  Yes.

22         MR. ERVIN:  And I think to address that, Judge, what

23     we have here is the loss calculation of intended loss --

24         THE COURT:  Uh-huh.

25         MR. ERVIN:  -- does not include a hard figure and we

10:39    1    don't have it in the presentencing report of an actual payout.
         2    We don't know how many policies actually paid out.  All we know
         3    is the amount of the policies.  We don't even know which
         4    policies that were granted for fraudulent information lapsed
         5    and would never have paid out by virtue of the premiums not
         6    being paid.  We don't have any of that information before us
         7    today.

         8            So what I'm putting to you is, we agree those policy
         9    figures and those policy values are $3.5 million, but we
        10    haven't presented nor has the government presented any
        11    information about what actually was paid out, so that actual
        12    loss is speculative.  A lot of those policies could have
        13    lapsed, a lot of those policies may have been declined by the
        14    underwriter, what have you.  We don't have any of that
        15    information today.

        16            So what I'm saying is it's more reasonable to consider
        17    what information we have in the form of actual gain by the
        18    defendant.  We know what that number is potentially much more
        19    so than we know what the actual loss as opposed to intended
        20    loss is.  So I think it's -- we just don't have that
        21    information.  So I think to hang our hat on the number
        22    3.5 million, we don't know that any of that money was paid out.
        23    We can assume some of it was.

        24            Your Honor, so again, I'd just say, in the *Livesay*
        25    case, the judge sentenced way below the guidelines, which was a

10:40  1    probational sentence.  I think that can be considered today.

2         And another reason for that is your standard

3    mitigation argument, and I'm going to introduce you to

4    Mr. Williamson himself.  He's 55 years old, living in the

5    Augusta/Aiken area.  His wife is here.  She's 43 years old.

6    His brother is here with him.  He has two daughters and two

7    grandsons.  He's been extremely active in the raising of these

8    two grandsons; I believe they're five and two.

9         THE DEFENDANT:  Almost three.

10        MR. ERVIN:  Five and almost three.  He's been very

11   involved in raising these two boys with his daughters who are

12   single mothers.  And, again, with the exception of the DUI that

13   is, for all intents and purposes, a moving violation, he's got

14   no criminal history with regard to any sort of actions like

15   this.

16        Judge, also, he's extremely involved in philanthropy.

17   He's involved in a group called Samaritans Purse, you may be

18   familiar with that, where they go to natural disaster areas

19   where he helps elderly.  He's also helped military veterans

20   with PTSD.  He has gone to disaster areas and presented his

21   time selflessly in helping this organization help others.  He

22   teaches Sunday school every Sunday in his church.  He's here to

23   take responsibility, Judge, and he prays that Your Honor will

24   take mercy on him in the sentencing with the possibility of a

25   probational sentence given that the guidelines are simply a

10:42    1    suggestion and that there are other alternatives to consider

2    when sentencing him here today.

3             THE COURT:  Thank you.

4             All right.  Mr. Williamson, I'm happy to hear from

5    you.

6             THE DEFENDANT:  Pardon me?

7             THE COURT:  I'm happy to you hear from you.  Is there

8    anything you'd like to state?

9             THE DEFENDANT:  Yes, ma'am, I would.  A lot of these

10   policies, a majority of them are term and they have a limit to

11   where it's not possible that someone -- the average person or

12   above could even afford the premiums once they get to a certain

13   term period.  One of the companies had like a 5-year/15-year

14   plan where it was -- they could go up in 5 years, but they call

15   it a 15-year plan.  And I never really understood it other than

16   them being able to protect themself from big losses, say a

17   natural disaster or something like 9-11 happened, you know, in

18   New York.

19            Also, there were people that I wrote that were not in

20   top health.  Now, these people would only qualify for a burial

21   policy for maybe 5,000 to 25, some companies went to 30,000.

22   The purpose of this is that they're paying a much higher

23   premium than they should -- well, I'm sorry about that, I

24   didn't mean to say it that way, but it's rated up very highly.

25            Now, the nonmedical policies, thirty something two, I

10:44   1    think, did ask for some information about the mortgages on
        2    there and my attorney has already addressed that.  It wasn't a
        3    requirement to where it had to be verified through going to the
        4    courthouse records or going to get -- you know, grabbing a
        5    payment book and making a copy or any kind of deeds --
        6                MR. ERVIN:  One second, Your Honor.
        7        (Off-the-record discussion between Mr. Ervin and the
        8    defendant.)
        9                THE DEFENDANT:  I've said enough about that.  I'm
       10    sorry.  But I do want this to be understood as a general truth,
       11    is that I've worked a lot of states and I have license in a lot
       12    of states, and especially around Georgia, Florida, and
       13    different other states.  Mostly Georgia and Florida.  I have
       14    a lot more business than any of this amount of Travelers that I
       15    did.  If I had been in, say, Florida and one of them called me
       16    and said, hey, you know, I want to get a policy from you, I
       17    heard about you from so-and-so, and I was going to be gone a
       18    week or two, I'd let them know, you may need to get, you know,
       19    a phone book out and look around for another agent or whatever.
       20    Because I feel like I was a very successful agent and I led the
       21    nation in sales a couple of years when I worked for a marketing
       22    company, and not to brag, but I just want you to understand,
       23    none of those were Travelers.  I did -- I went kneecap to
       24    kneecap at their table, they would fill out a form, had asking
       25    for an agent to contact them, and it would have height, weight,

10:45    1    date of birth, phone number, sale work, and all those things.

2    And I would call, set it up, and go and see them.  Sometimes it

3    would be seven, eight, ten people a day.

4         But I was single for about ten years.  I was married

5    18 years and we had two children, and, you know, one of them's

6    married and I'm very happy for her, you know, she's got a son

7    and she's taking care of her husband's two children, and I've

8    always, you know, been -- you know, wanted to work because I

9    want to provide a living for my family, and I stayed very busy

10   not around North Augusta, it would only be if I got a call and

11   it made sense.  You know, I would ask them, how's your health?

12   What kind of medicines you taking?  And we -- to keep from

13   having to waste gas and time and their time, my time, the

14   company's time, I, you know, would do a risk assessment to say,

15   look, this person has this wrong with them.  They're taking

16   these two medicines, like maybe a blood thinner, that was a

17   no-no, you know, those kind of things.

18        But I just wanted you to understand that I did have

19   a lot more business, Judge, you know, elsewhere and traveling

20   a lot, being away from home a lot.  So when I was a single man,

21   I was home quite a bit.

22        THE COURT:  Okay.  And what I have is a few questions

23   for you.

24        THE DEFENDANT:  Sure.

25        THE COURT:  You are here because you pled guilty to

10:47   1    conspiracy to commit mail and wire fraud, and it's determined

2    that during the course of the investigation you had written,

3    you know, several policies which called for an insurance home

4    loan information, and that on those policies it would indicate

5    a certain value of either the life insurance policy and the

6    value of the home, you know, to support I guess the policy and

7    the need for the insurance.  But according to the information

8    provided, sometimes people did not know of the policy, or they

9    would indicate a home that had an excessive value, but yet they

10   lived in a mobile home and things of that nature.  But mostly

11   important, and the reason that you're charged with conspiracy

12   to commit mail and wire fraud, is that the applications

13   contained fraudulent or false information.

14       So are you saying that you don't know of this

15   information as it's received by you, or at some point when you

16   did learn of it, you did nothing about it?  I mean, I'm trying

17   to figure out from you what is it that you're saying that you

18   know that you did that was illegal?

19       MR. ERVIN:  Your Honor, may I briefly talk with my

20   client?

21       THE COURT:  Yes.

22     (Off-the-record discussion between Mr. Ervin and the

23   defendant.)

24       THE DEFENDANT:  Yes, ma'am, I want to take

25   responsibility for --

10:49    1          THE COURT:  I'm not asking that question.

2          THE DEFENDANT:  Oh, I'm sorry.

3          THE COURT:  Taking responsibility is not an admission

4     of guilt.  So I need to know what you did that you knew was

5     illegal.

6          THE DEFENDANT:  Yes.  For instance, the mobile home

7     thing, you know, I know that there were people -- you know,

8     there were a lot of mobile home repos and stuff and devaluated

9     a lot that were appraised at a higher amount, but yes, ma'am,

10    you know, I -- as far as like sitting in a mobile home and they

11    say they owe a certain amount, there were times, yes, ma'am,

12    that I -- Judge, that I should have used better judgment, and I

13    take fault for that, that I should have used common sense as

14    far as the values, not knowing what they were, but yes, I --

15         THE COURT:  What about just on the state of someone's

16    health or the fact of their age, would they have qualified for

17    a policy at, you know, 250 or so if they were ages 50 or so

18    based on their health or anything that you might have known

19    about?

20         (Off-the-record discussion between Mr. Ervin and the

21    defendant.)

22         THE DEFENDANT:  Yes, I had one circumstance that I

23    would take responsibility for as well as what I had mentioned

24    where there was a -- I had met a Mary G. Carroll, they called

25    her Mary Cat, her husband and this man in a car at the Greg's

10:51   1   grocery store or Greg's Gas or what have you, and she
        2   introduced me to him as her brother and he was a white man.
        3   Later, a week or two later, you know, she called, said she
        4   wanted to get rates for him, because he was out working, and
        5   event- -- eventually we met and that night this same man was
        6   there representing himself as a black man.  In other words, his
        7   name was Joseph or Joe Pew, P-E-W, I believe it was, and I went
        8   to the home, it was dark in there and stuff, and they showed me
        9   an ID, but it wasn't -- it was messed up, like it had been in a
       10   washing machine or something, I have no idea.

       11          And being that I had known Mary Carroll from a rosary
       12   that I spoke at for a girl that had passed away that worked
       13   with me that lived there for a few years and married a person
       14   out from the village, she became an insurance agent, and I
       15   spoke at her rosary at her mother's request, I met Mary G.
       16   Carroll.  For seven months -- seven months after that is when
       17   this policy was written and I trusted her because she was in
       18   the church, she seemed -- you know, we talked about faith and
       19   those kind of things.

       20          MR. MAY:  (Stands up.)

       21          THE COURT:  You'll have your moment.

       22          THE DEFENDANT:  So in the end I felt that this woman
       23   was pretty straight, she was a mother, all those things.  But
       24   what happened was ten and a half years later I found out that
       25   Joseph Pew was a black man when I was showed the picture of his

10:52   1    driver's license from the FBI.

2              THE COURT:  Okay.  And again, that's a different

3    scenario, something perhaps information you came into later.

4         (Off-the-record discussion.)

5              THE COURT:  And I'm not disputing that you've written

6    several policies that were fine.  Nobody is challenging every

7    single policy you've written over the course of your career.

8              I'm just asking you that with respect to this

9    particular community, what is your knowledge base of who they

10   are, what they've done, and whether they're presenting false

11   information to you knowingly, and "knowingly" meaning that you

12   know this, but yet you still let the policy go forward.

13             THE DEFENDANT:  Well, I admit that that -- I should

14   have used better discretion as far as making it known --

15             THE COURT:  And I'm not asking about discretion.  I'm

16   asking, did you know that they were giving you false

17   information and that you went ahead and participated in concert

18   with them, essentially acting with them to put the false policy

19   application, let it go through based on false information that

20   you knew was false?

21             THE DEFENDANT:  When it came -- when it came down to

22   values of the home, yes, ma'am, I -- Judge, yes, Judge, I could

23   have used better judgment and said, okay, this place isn't

24   worth this much, you know, you can't do this amount, you know,

25   you can't owe this amount, no bank would loan you.  So I do

10:54  1    admit to that.

2             And I also want to, you know, stand that I don't know

3    the health of these people, you know.  I do know that there was

4    a contestable period, as you know, for two years where if there

5    was any fraud, that it could have been contested, and I would

6    make sure that the applicant knew that, so if you lie about

7    smoking or you got some health issues, they're going to find

8    out.  It's -- it's --

9             THE COURT:  Did you come to a point where when

10    policies were written, that you were still involved with the

11    Travelers when those policies paid out?  In other words, you

12    would have written an application, let's say, in year 2000 and

13    then still writing applications in 2005, but some of the people

14    who had policies written in 2000, those started to pay out

15    because the person died?

16             THE DEFENDANT:  Excuse me, please.

17        (Off-the-record discussion between Mr. Ervin and the

18    defendant.)

19             THE DEFENDANT:  As a producer, I know I'm supposed to

20    take the application, submit it in and deliver the policy if

21    it's approved.  At the beginning of the application process, if

22    I -- there may have been -- there was times that I should have

23    used better discretion when it came down to -- in other words,

24    I'm trying to go in my mind and remember anything that may

25    have -- that would have happened.

10:56   1          THE COURT:  At any point, did you --

     2          THE DEFENDANT:  And yes, yes, I know that there's some

     3   things -- excuse me, I didn't mean to interrupt you.

     4          THE COURT:  Okay.  Well, no, I was just saying, the

     5   point being that at some point did you get kind of wind that

     6   they were, you know, purposely giving you all this false

     7   information and you kept writing policies?

     8          THE DEFENDANT:  Yeah, there was a time -- you know, a

     9   point in time that I felt like that they seemed to be similar.

    10   In other words, one would buy a car, you know, house, get

    11   insurance, those kind of things, it seemed to be --

    12          THE COURT:  And you kept writing policies.

    13          THE DEFENDANT:  -- similar.  For a while, yes, ma'am.

    14          THE COURT:  Okay.

    15          THE DEFENDANT:  Yes, ma'am.

    16          THE COURT:  Okay.  Thank you.  Did anyone out of your

    17   family wish to speak?

    18          MR. ERVIN:  Yes, ma'am.

    19          THE COURT:  Come forward, yes.  Please state your

    20   name.

    21          MR. TONY WILLIAMSON:  Yes, Judge, my name is Tony

    22   Williamson.

    23          THE COURT:  Okay.

    24          MR. TONY WILLIAMSON:  And Wade is my brother.  And I

    25   just, nothing -- I know little about the case, I'm not here to

10:58  1    talk about the case, but just his character.  I've been in law

2    enforcement myself now almost 30 years.  My brother has always

3    been an honest person.  I've never known him to -- I know I

4    heard about this DUI, but he's always been a hard working man.

5    He loves his family.  He's very religious.  He's got a modest

6    home.  He doesn't live past his means.  He's always been a role

7    model for me.  He's always worked hard all his life.  Even in

8    high school he had a job.  He's done well with what God's given

9    him.  You know, and I'm not here to say anything about the

10   case.  Certainly in my position it would be wrong to.  We've

11   talked very little about it.

12          But I just wanted you to know that he is a good man

13   and that, you know, he's been on this earth 55 years and other

14   than that DUI that I heard about, I've never known him to do

15   anything illegal certainly.  We live in the same town.  I'm at

16   his house a lot.  And, you know, he's just, he's a good man,

17   that's all I can say.  He's my brother; I love him.  And I know

18   he can learn from this.  And, you know, I've stayed out of the

19   case and, you know, I just wanted you to know that -- and he is

20   honest.  He's an honest man, without getting into anything

21   else.  But other than that, I just wanted to let you know that,

22   ma'am.

23          THE COURT:  Thank you.  Appreciate it.

24          MR. TONY WILLIAMSON:  You're welcome.

25          THE COURT:  You can come forward.  Please state your

11:00  1    name for the record.

2              THE WITNESS:  It's Carmen Pena.

3              THE COURT:  How do you spell your first name?

4              MS. PENA:  C-A-R-M-E-N.

5              THE COURT:  Okay.

6              MS. PENA:  Your Honor, thank you for this opportunity.

7    I'm Douglas wife and I stand here in this moment because I

8    believe in him, in his honesty and his integrity.  Those are

9    values that were important for me at the moment that we get

10   married.  And in five years since we met until this moment, I

11   have a lot of opportunity of see if he got those value, and

12   believe me, I see it and I prove it.  Sometime we'll receive --

13   he will being receive call in front of me that they're having

14   client that say, for example, I need you to help me with this,

15   I can give you some money.  And clear, clear, my husband say,

16   you don't need to give me nothing, you just need to call this

17   department.  This is not -- you don't need to pay anything to

18   me because I got it when I sell you a policy, I got a

19   commission and that's it.

20             And I have been working with him.  I got my insurance

21   license too here.  Before, I was working in my country; I work

22   for a big corporation like sales training manager.  So when I

23   came here, we met, we travel a lot, and we decide to get

24   married, so I decide to work with him too.

25             So, Your Honor, I need to tell you that I training

11:02  1    a lot of people in my life.  I make a program for thousand of

2    people, like manager.  I have to design and apply program for

3    training.  But Wade, Douglas Wade is very consist in the way

4    that he do this stuff.  It's not like he got any difference.

5    No, he do this stuff consistently.  He invest a lot of money to

6    get information for the client leads, call those clients,

7    making appointment, and visit the client to the house, and we

8    got a process.

9            And about 3 percent of those application the

10   underwriter don't ask nothing, but about 97 percent the

11   underwriting has question about those application or has

12   additional requests because the client maybe forgot or maybe

13   omit some information at the moment that we ask.

14           So, Your Honor, I have seen my husband and I believe

15   in him.  We work together Sunday school, we teach together, we

16   have about more than a year in the church next to our house,

17   but we participate with a lot of church and a lot of activity

18   and one of that is Samaritan Purse.

19           My husband work very, very hard.  He's very consist in

20   what he do.  He's very honest in what he do.  And if he see

21   somebody doesn't have the potential, we ask to the underwriting

22   person, make this assessment or we don't send -- continue with

23   this process.

24           This has been my experience like a wife, like working

25   together, like his life partner.  I would like that you

11:04    1    consider these thing.  I think that he was in the wrong place

2    with the wrong people and this have been out of control.  Thank

3    you.

4         THE COURT:  Thank you.  Okay.  Government, and then

5    I'll let defense conclude.

6         MR. MAY:  Your Honor, I beg the Court's indulgence for

7    one second.  I want to see if I need to put up a witness,

8    because I believe that there's been some falsities testified

9    to.

10        THE COURT:  Okay.  And a couple of things I want you

11   to address to me in your presentation.  One, it appears that

12   you are charging the defendant with intentional versus

13   constructive knowledge, first.

14        And then secondly, on the issue of the amount of loss,

15   there's a suggestion by defendant's counsel of you all knowing

16   actually what was netted from the persons who actually had the

17   policies or applications or things of that nature because he's

18   trying to use the Eleventh Circuit case to vary intended versus

19   actual loss, so just put that in your presentation.

20        MR. MAY:  Your Honor, I'm going to call Ron Grosse --

21        THE COURT:  Okay.

22        MR. MAY:  -- because I believe that I can show that he

23   has lied to the Court today --

24        THE COURT:  Okay.

25        MR. MAY:  -- and that much of what he has said has

11:05   1    been misrepresentations.

2              THE COURT:  Okay.  Thank you.  If you can please be

3    sworn in.

4              COURTROOM DEPUTY:  Raise your right hand to be sworn.

5              RONALD GROSSE, GOVERNMENT WITNESS, SWORN

6              THE COURT REPORTER:  Could you state and spell your

7    last name for me?

8              THE WITNESS:  G-R-O-S-S-E, first name Ronald.

9                         DIRECT EXAMINATION

10   BY MR. MAY:

11   Q.  Mr. Grosse, for the record, please state where you were

12   previously employed when you left and what do you do now?

13   A.  I've been employed with the -- as a special agent with the

14   Federal Bureau of Investigation for approximately 28 and a half

15   years.  I retired on August 31st of this year and I'm currently

16   not working.

17   Q.  All right.  Were you one of the two case agents that

18   investigated the fraud coming out of Murphy Village?

19   A.  Yes, I was.

20   Q.  Who else did you do this investigation with?

21   A.  Senior Investigator Michael Nelson with the United States

22   Marshal Service.

23   Q.  Was a portion of -- or please describe generally the

24   various types of fraud found, but specifically folks in life

25   insurance fraud.

11:06  1    A.   Well, we charged racketeering conspiracy in this case, but
2    some of the racketeering activity that was underlying that
3    activity was -- we charged individual counts of mail fraud
4    involving the mailing of insurance policies, we charged mail
5    fraud in connection with the mailing of fraudulent food stamp
6    applications, we charged wire fraud in the connection -- in
7    connection with the wiring of, or the faxing or wiring of
8    fraudulent motor vehicle applications, we charged interstate
9    transportation of stolen property for the interstate
10   transportation of motor vehicles taken by fraud across state
11   lines.  I'm probably missing three or four different individual
12   counts.
13   Q.   Also, was money laundering charged?
14   A.   Money laundering was charged, structuring.
15   Q.   And what was the main manner and means that the enterprise
16   obtained wealth?
17   A.   The -- all of the substantive charges or violations I just
18   described were really, in our theory of the racketeering
19   enterprise, were for the sole purpose of generating income to
20   finance their life insurance schemes.  So the main -- to answer
21   your question, the main goal of the enterprise was to buy life
22   insurance and gain wealth through the payout of fraudulent life
23   insurance applications.
24   Q.   And through the investigation, did you review life
25   insurance applications?

11:08

1    A.   I did.

2    Q.   Approximately how many do you think you reviewed?

3    A.   Over 4,000.

4    Q.   And was Mr. Williamson one of the people who was a common

5    producer or life insurance agent in many of these?

6    A.   Yes.   There were a number of agents that would come in and

7    out of what's commonly referred to as The Village to write

8    policies for them, but through my examination of those some

9    4,000 applications, there developed a pattern of those who were

10   more prolific.   And there were basically five that wrote the

11   majority of the policies in the time period that we looked at

12   those applications, and Mr. Williamson was one of those.

13   Q.   And Mr. Williamson testified in the grand jury; is that

14   correct?

15   A.   Yes, he did.

16   Q.   And he provided information that were actually the

17   substance of some of the charges of his indictment, correct?

18   A.   Yes.

19   Q.   Now, I'm going to ask you to talk to the Court generally,

20   when we see -- and we're talking about Mr. Williamson and the

21   fraud that he committed on the life insurance.   Can you talk to

22   us in general terms, and then we'll start asking specific, as

23   far as what type of fraud we saw and how you could prove that?

24   A.   Well, there was -- it was misrepresentations as minor as

25   using a Post Office box as opposed to an address, using a

11:09  1  Social Security number instead of a driver's license number,

2  which many of the applications would ask for a driver's license

3  number and the Social Security number would go in there,

4  knowing that in South Carolina the Social Security number is

5  not used as the driver's license number.  In some states it is,

6  but in South Carolina it's not.  The insurable interest was

7  often incorrect or misrepresented.  The -- not all applications

8  required an income representation or a net worth, but often

9  those that did were misrepresented; in particular, the

10  applications where the insured was a female.

11  Q.  Talk to the Court a little bit about why we know and how he

12  would have known that the representations on the females, as

13  far as net income -- or income and net worth were

14  misrepresentations.

15  A.  Well, Mr. Williamson wrote policies in Murphy Village for a

16  long time.  As a matter of fact, if my memory serves me well

17  enough, it was a Traveler -- very few of the Traveler women

18  work.  I think during the course of our investigation we ran

19  across less than five, less than a handful.  One of them that

20  did work actually worked for Mr. Williamson early on and I

21  think that might have been his entrée into The Village.  She

22  was an office worker for him.

23     So based on our investigation and the knowledge of people

24  in the community, not just in the Traveler community, but

25  outside in the general community in North Augusta, and in

11:11

1    Augusta, know that the women don't work.  I mean, it's common

2    knowledge.  And Mr. Williamson, in my estimation, certainly

3    would have known because he had a Traveler woman that worked

4    for him.  So he was intimately knowledgeable of the whole, the

5    culture and certainly of his clients.

6    Q.  Approximately how many of the policies that were written

7    had income where it shows women worked?

8    A.  Well, of the approximate 400 policies on North Augusta

9    Travelers that we know Mr. Williamson wrote, and that's just

10    what we knew of and I'm sure there were more, but about 200 of

11    those were women, where the insured was women.  68 of those 200

12    that -- where women was the insured showed an income and/or net

13    worth for those women, and some of them would ask for

14    employment so it would show employment, like bookkeeper or

15    something like that.  So...

16    Q.  And what is the loss amount from those 68 life insurance

17    policies which are fraudulent on their face?

18    A.  Well, if you're equating loss with face value of those

19    policies, of the 68, which was a subset of the 200 women, 68

20    that showed income for women, the value of -- the face value of

21    those 68 policies was $11,130,000.

22    Q.  All right.  Of the 398 policies that you mentioned, what is

23    the face value of the total 398 policies?

24    A.  $54,284,000.

25    Q.  So 54 million.  All right.  So while not all the insured

11:12

1    have died, but as you were looking at it and talking to the

2    insurance company, what was the approximate amount of time

3    between application and death?

4    A.   For the policies that were -- the applications that were

5    written by Mr. Williamson or submitted by Mr. Williamson, the

6    approximate number of years between the date of the application

7    and the date of death of those who died that I knew of, during

8    the time period that I looked at the policies, that I knew of

9    the date, that had a date of death compared to the date of the

10   application, was 4.8 years was the time difference between

11   application and date of death.

12   Q.   Do you know how much has been paid out?

13   A.   I do not.

14   Q.   Do you know that policies have been paid out?

15   A.   I do know some have.  I did not, no.

16   Q.   Regarding various specific people who he wrote policies

17   either as the beneficiary of or of the insured, talk to the

18   Court a little bit about Courtney Carroll.

19   A.   Courtney Carroll was a young lady who was indicted in our

20   case and has pled guilty in our case -- I mean, the FBI's case,

21   in the overall racketeering case.  We interviewed Courtney

22   Carroll, and of course she was involved in some of the 4,000

23   applications, the 400 written by Mr. Williamson and others, but

24   what is significant is that Mrs. Carroll, Courtney Carroll, was

25   the daughter or the beneficiary on the following policies where

11:14

1    she was listed as the daughter:  She was listed on two policies

2    written by Mr. Williamson on John F. Carroll where she was

3    listed as the daughter.  She was listed on two policies on

4    William J. Costello where she was listed as the daughter.  She

5    was listed on -- she was the beneficiary on one policy on Jimmy

6    Carroll where she was listed as the daughter.  So that's five

7    applications on three different men where she was the

8    beneficiary and she was listed as the daughter.  And those were

9    all written by Mr. Williamson.

10   Q.  So Mr. Williamson had one woman as having three different

11   fathers.

12   A.  Yes, and that's attributable to Mr. Williamson, but overall

13   in our examination of Mrs. Carroll as a beneficiary, she was

14   actually the, quote, daughter of six different men.

15   Q.  So, and you mentioned John F. Carroll, and that's John

16   Fitzgerald Carroll, can you please tell the Court a little bit

17   about him?

18   A.  He was a Traveler, a man who had a congenital skin disease

19   from birth and that disease was -- it progressed to where his

20   skin would basically fall off.  He lost fingers, he lost part

21   of his -- he lost his nose, he lost his face, portions of his

22   face, and he eventually died.  I think he was 55 years old when

23   he died.

24        MR. MAY:  I beg the Court's indulgence.  I'm going to

25   just direct the Court, there's a picture of Mr. John F. Carroll

11:15

1    in the sentencing memorandum.

2          THE COURT:  Okay.

3    BY MR. MAY:

4    Q.  Is it abundantly apparent that he has a congenital defect

5    when one looks at his picture?

6    A.  There's no question.

7    Q.  It's like an aggressive form of leprosy, is that fair, as

8    far as appearance?

9    A.  I've never seen anybody with leprosy, but it's a very

10   aggressive form of a horrific skin disease.

11   Q.  And in those policies, Mr. Williamson would have

12   represented that he either met with them and/or saw a driver's

13   license, correct?

14   A.  That was part of Mr. Williamson's grand jury testimony,

15   that when he took an application from an insured, that he would

16   examine the license -- driver's license of that person and

17   compare it with the insured that was sitting in front of him.

18   Q.  Was Mr. -- or do you know if Mr. John F. Carroll ever had

19   any children?

20   A.  He had no children.  He was never married.

21   Q.  So Courtney Carroll was not a daughter of John F. Carroll.

22   A.  No, and if I could expound a little bit on John F.

23   Carroll --

24   Q.  Please do.

25   A.  -- as it relates to Mr. Williamson, there were other

11:16

1  policies that were written by Mr. Williamson where Mr. John F.

2  Carroll was listed -- was the insured and listed as the father.

3       For example, Mary B. O'Hara was listed -- was the

4  beneficiary of a policy on John F. Carroll, which she was

5  listed as the daughter on one, and on another policy written by

6  Mr. Williamson, she was listed as the sister-in-law.

7       There was a policy on Mr. John F. Carroll written by

8  Mr. Williamson.  The beneficiary was Ann Francis Sherlock, who

9  was indicted in the racketeering case and subsequently pled

10  guilty, and Ann Francis Sherlock was listed as the daughter and

11  she was not.

12       There was a policy written by Mr. Williamson on John

13  Francis Carroll, and Theresa Ann Sherlock was the beneficiary

14  and she was listed as a daughter and she was not.

15       So those are just some others that were alleged relatives

16  of Mr. Carroll who were not.

17  Q.   Then you also have found other people who had numerous

18  policies on them where there is not -- where they did not have

19  children; is that fair to say?

20  A.   Yes.

21  Q.   Can you please talk to the Court a little bit about

22  Margaret "Robbie" Sherlock?

23       MR. MAY:  And Your Honor, I'd turn your attention, in

24  the original sentencing memorandum for 1:16-632, there's a

25  picture of Ms. Sherlock and a picture of her home, for the

11:18

1   Court's -- if the Court wants to look at it.  And I believe
2   that Special Agent Grosse can adequately describe it, but I
3   just want to say, if you want to look at it, there's a picture
4   of her and her home that he's about to talk about.
5   BY MR. MAY:
6   Q.  Go ahead, Special Agent Gr- -- or former Special Agent
7   Grosse.
8   A.  Ms. Sherlock was a Traveler.  She lived in the portion of
9   The Village that is kind of lower income portion where there's
10  mobile homes as opposed to the other side of the street where
11  there's large homes.  But she lived not in a mobile home, but
12  she lived in a camper.  Mike Nelson and I interviewed
13  Ms. Sherlock and she -- while we sat there, she must have
14  smoked three or four cigarettes, although most of the
15  applications, if they asked for health questions, it indicated
16  she didn't smoke, but that's a minor aside.  But --
17  Q.  How many policies did you find on Margaret Sherlock?
18  A.  I'm shooting from memory to say there was in excess of 30.
19  11 of those policy applications were written by Mr. Williamson.
20  Now, Mrs. Sherlock was never married, had no children.  Of
21  those 11 policy applications written by Mr. Williamson, there
22  were misrepresentations as to income, net worth, and her
23  beneficiaries, and in particular, one of the beneficiaries was
24  a Theresa Ann Sherlock, who was listed as Margaret Sherlock's
25  daughter.

11:19    1        Now, Theresa Ann Sherlock is the same Theresa Ann Sherlock

2    I mentioned previously that was the daughter of John F.

3    Carroll.  She was a beneficiary on a policy of John F. Carroll

4    as a daughter and she was also listed on a policy of Margaret

5    Sherlock as the daughter, neither one of whom were married, and

6    they certainly weren't married to each other.  And I know for a

7    fact that that policy paid out.  It was a $400,000 policy that

8    paid out to Theresa Ann Sherlock when Margaret Sherlock died.

9    Q.  Talk to the Court a little bit about, when you say that she

10    lived in a trailer, did she live like in a doublewide?

11    A.  No, I said -- she didn't live in a trailer, she lived in a

12    camper.  Most of the property, most of the residences on that

13    side of the Highway 25 were mobile homes.  There were maybe one

14    or two campers, actual carpers, you know, the tow-behind

15    campers.  She lived in a camper.

16    Q.  So she lived in a tow-behind camper, but Mr. Williamson has

17    represented that she has a high net worth on some policies?

18    A.  Well, I wouldn't -- I don't know that it was high, but it

19    was a net worth and it was an income.  She never worked, but

20    several of the applications indicated that she did work and had

21    an income.

22    Q.  Now, Mary Gorman Carroll was scheduled or was going to come

23    testify today but for the fact that we didn't believe there was

24    a -- there was going to be any contestation as far as the

25    facts; isn't that correct?

11:20  1   A.   That's correct.

2   Q.   All right.  Talk to us a little bit about Mary Cat Gorman.

3   A.   She's a Traveler.  She lived in The Village and she was

4   indicted and pled guilty in the overall racketeering case.

5   Q.   And Mr. Williamson insured her brother; isn't that right?

6   A.   Well, he insured her husband, but there was I think two

7   policies on a Joseph Pew and the relationship on the policy

8   applications was listed as brother, that's correct.

9   Q.   Are they brothers?  Are they biological kin?

10   A.   No.

11   Q.   All right.  How do you know this?

12   A.   Because Mary Cat told us they were not brothers and -- now,

13   not that two people of different races couldn't be brother and

14   sister, but Mr. Pew is an older dark-skinned African-American

15   fellow and Mary Cat is a older extremely light-skinned white

16   woman.  And the fact that she told us they weren't related.

17   Q.   And with Ms. Gorman, who was going to testify today but for

18   what we believed was an uncontested hearing, did you interview

19   her --

20   A.   I did.

21   Q.   -- regarding this?

22   A.   Yes.

23   Q.   What information was provided to the FBI?

24   A.   Well, there was a lot of information she provided, but in

25   particular, as it relates to the applications we're talking

53

11:22

1    about, she said that the information on the application as it

2    relates to Mr. Pew was provided by Mr. Williamson, not her.

3    Q.   All right.   Talk to us generally, talk to the Court

4    generally about also what you saw regarding the addresses of

5    the insured oftentimes being the addresses of the

6    beneficiaries.

7    A.   Well, sometimes the -- on the application, you know, they

8    asked for an address and often the address for the -- listed as

9    the address of the insured would be the address of the

10   beneficiary.

11   Q.   And did you learn as to why this happened throughout the

12   investigation?

13   A.   Well, it was our conclusion based on our investigation that

14   often the insured weren't aware the policies were being taken

15   out on them, so the -- if you had the address for the

16   beneficiary, any correspondence from the insurance company

17   would then be sent to the beneficiary, not to the address of

18   the insured.

19   Q.   For instance, can you talk to us regarding Courtney

20   Carroll?   Were some of her numerous fathers' addresses actually

21   hers?

22   A.   Yes.

23   Q.   And again, this was so that way she could control all

24   correspondence, correct?

25   A.   Yes.

11:23    1    Q.   So when Mr. Williamson testified that he always looked at

2    the driver's license of the insured and put down that

3    information, do you have reason to believe that was false?

4    A.   Many cases I believe that it did not -- it was false.

5    Q.   Because the address does not match what would have been on

6    the lic- --

7    A.   That's correct.

8    Q.   -- on the driver's license.

9    A.   Correct.

10    Q.   Talk to us a little bit about the mortgages and the

11    mortgage life insurance applications that were submitted by

12    Mr. Williamson.

13    A.   Well, these -- well, some of the most glaring

14    misrepresentations, in my opinion, and in my review of all of

15    these applications, there were some -- there were a couple of

16    insurance companies that had a product that -- in that the life

17    insurance was tied to a mortgage on a piece of property, and

18    without that mortgage information, the policy would not have

19    been issued.  In my review of these policies, there were 45

20    that I found that were written -- these applications that were

21    written by Mr. Williamson.

22    Q.   All right.  Let me pause you there.  Did you find mortgage

23    life insurance policies written by any other agent?

24    A.   Not that I recall.

25    Q.   So if Mr. Williamson -- this appears to be something that

11:24    1    was unique to Mr. Williamson, to the best of your recollection?

2    A.    To the best of my I recollection, yes.

3    Q.    All right.  I'm sorry for interrupting.

4    A.    So part of the application, it was a standard -- pretty

5    much a standard application, but there was a section that

6    called for mortgage information.  It would ask for the mortgage

7    company, the amount of the mortgage, it would ask for a loan

8    number, and a date of the closing.

9         And where -- I'll just tell you what my examination of it

10    is and you can compare it to the testimony we already heard

11    here today, but the numbers on the application, the mortgage

12    numbers, you know, each mortgage company has a different

13    protocol for the way they number their loans.  You know, they

14    could have letters in them; they could have numbers in them.

15    But in this instance there were several different alleged

16    mortgage companies, BB&T, Bank of America, Wachovia, but almost

17    without fail those loan numbers that were on these 45 separate

18    applications were the same number, the same amount of numbers,

19    and sometimes, you know, just looked like a scrambling of the

20    same numbers.  So they were numbers, and they were very

21    similar, where normally you would expect that different loan

22    numbers would have a different protocol for their loan numbers.

23    So that was significant.

24         And almost without fail, the closing date on the -- for the

25    mortgage was approximately anywhere from six months -- no

11:26

1  longer than six months out of the date of the insurance

2  application, the policy application, and that was almost

3  without fail.

4  Q.  Were there -- in your examination, did you find that there

5  were various life insurance policies on the same person that

6  listed different mortgages on the same property?

7  A.  Yes.

8  Q.  Talk to the Court a little bit about that.

9  A.  Well, as I was preparing to come today, that's one of the

10  areas, and I had a completely separate spreadsheet for that and

11  I failed to look at that one, but yeah, there were -- there

12  were, let's say, for example, Mary Cat Gorman, I think there

13  were a couple policy applications that had mortgage information

14  on her home and so they were -- this is as an example, there

15  were different lenders with different loan numbers on the same

16  piece of property during the same time period, and she lived in

17  a mobile home, so even one of those applications was more than

18  likely not -- not true.  So in order for all of them to be true

19  was highly unusual, but...

20  Q.  And so, but this is Mr. Williamson writing these policies,

21  correct?

22  A.  He submitted those applications and appeared like -- and I

23  think he might have told me this in our interview, that the

24  applications were pretty much -- they were typically done in

25  the handwriting and written by the insurance agent, and I found

11:27    1    that across the board.  Because as it was explained to me, the

2    Travelers have notoriously bad handwriting.  Some of them are

3    illiterate, some of them, they just don't -- so in order to

4    submit an application, a legible application, the insurance

5    agent would write them themselves.  So all of these 45 mortgage

6    applications are in his handwriting with similar information.

7        And typically they were -- they were the larger policies,

8    in a sense.  They were anywhere from 150 -- usually 150 to

9    $250,000.

10    Q.  Do you know how much those 45 -- the face value of those 45

11    policies were?

12    A.  The total for those 45 policies, the face value

13    is $7,049,000.

14        MR. MAY:  I beg the Court's indulgence.

15    (Off-the-record discussion.)

16    BY MR. MAY:

17    Q.  So can you please talk to the Court a little bit about how

18    Mr. Williamson benefited financially about this.

19    A.  Well, it's my understanding from talking to the insurance

20    companies and other agents is that when a policy is written, an

21    agent would receive a commission based on the face value of the

22    policy and usually based on the first-year premiums, and then

23    after that first year they would -- their commission would be

24    significantly reduced.  But as long as that policy stayed in

25    effect, they would receive some residual from that policy.

11:28

1    Q.  Do you know of any term life insurance policy that is only

2    4.8 years?

3    A.  I'm sorry?

4    Q.  Do you know of any term life insurance policy that is only

5    4.8 years?

6    A.  I'm not aware of -- there might be a product, but not one

7    that I'm aware of.

8         MR. MAY:  I have no further questions at this time,

9    Your Honor.

10        THE COURT:  Thank you.

11        MR. ERVIN:  Thank you, Your Honor.  May it please the

12   Court, briefly.

13        THE COURT:  Okay.

14                    CROSS-EXAMINATION

15   BY MR. ERVIN:

16   Q.  Agent Grosse, appreciate you being here today, appreciate

17   your cooperation with the defense in his plea and sentencing.

18        You're aware that Mr. Williamson pled guilty and admitted

19   to his involvement in this case, correct?

20   A.  I'm aware of that, yes, sir.

21   Q.  Okay.  And you're also aware that in this sentencing we

22   withdrew objections based on loss calculation, correct?

23   A.  I'm aware there were objections and they were withdrawn,

24   yes, sir.

25   Q.  And that the government and the defense agreed to a number

11:29

1    between 3.5 and 9.5 million, that was the level of loss that we

2    had agreed to cap.

3    A.    That's my understanding, yes, sir.

4    Q.    And that would be intended loss as opposed to actual gain

5    by the defendant, correct?

6    A.    That's correct.

7    Q.    Okay.  And today, you nor the government has presented any

8    information about actual payouts of any of these policies,

9    correct?

10   A.    That is correct.

11   Q.    And you're not aware of what that number may be, correct?

12   A.    No, I'm not.

13   Q.    And you're also not aware nor has the government presented

14   any information about policies that were either granted but

15   lapsed, or that a beneficiary did not collect, or that premiums

16   were not paid, correct?

17   A.    True, yes, sir.

18   Q.    So it's speculative to consider any figure of actual loss

19   as a result of this criminal act.

20   A.    I don't want to speak for Mr. May, but I don't think he's

21   made any representation about actual loss as it is to the

22   insurance company.  I mean, the figure you talked about, the

23   3.5 to 9 or whatever it is was the intended loss.

24   Q.    Right.  But there is no information with regards to actual

25   loss, correct?

11:31

1  A.  Not that was presented today that I'm aware of, other than

2  the one or two policies I mentioned about that were paid out

3  that I knew of.

4  Q.  But other than that, you yourself can't even speculate with

5  regards to what an actual loss would be.

6  A.  Sitting here, no, I can't.

7  Q.  Okay.  And you investigated the Travelers community for

8  quite some time, correct?

9  A.  About three years, yes, sir.

10  Q.  And that community is fairly adept in fraudulent activity;

11  wouldn't that be safe to say?

12  A.  I think it's fairly safe to say.

13  Q.  They would be considered career criminals in the white

14  collar fraudulent crime world, wouldn't you say?

15  A.  In many aspects of crime, white and blue collar, but -- not

16  all of them, but a fair number, yes, sir.

17  Q.  In fact, you've learned quite a bit of interesting schemes

18  that this community would come up with from town to town,

19  correct?

20  A.  I learned a lot, yes, sir.

21  Q.  Okay.  And would you say that Mr. Williamson was certainly

22  not the mastermind behind these schemes of insurance fraud?

23  Would you say the origin of the scheme would be the Travelers

24  as opposed to any insurance agent that came in their net of

25  schemes?

11:32  1   A.  I don't know that you could characterize him as a

2   mastermind, but certainly -- and what I -- how -- I always used

3   to characterize the insurance agents as the gatekeepers.

4   They're the ones that have the opportunity and the ability to

5   quash a fraudulent application before it gets to an

6   underwriter, and I think that was their obligation.

7   Q.  One figure that we can roughly estimate is what

8   Mr. Williamson actually gained as a result of this criminal

9   activity.  Wouldn't you say that's fair to say?  And that would

10  be his commissions based on yearly premiums.

11  A.  That number is probably attainable, yes, sir.

12  Q.  Okay.  But again, actual loss, and intended loss even --

13  "intended loss" being a cumulative figure of insurance policy

14  values versus "actual loss" being insurance policies that

15  actually paid out -- those numbers are pretty exaggerated and

16  in some cases speculative, wouldn't you say?

17  A.  I lost the train of thought there.  What's speculative?

18  Q.  The actual payouts of any of these policies, if they ever

19  paid out, or the numbers of policies that lapsed due to

20  nonpayment of premiums, that sort of thing, that Mr. Williamson

21  would have no --

22  A.  Well, it would be speculative of me right now to say that,

23  but I think it's something that can be researched.  But, you

24  know, in fairness, it could be -- maybe it was a fault of my

25  own investigative work while I was an agent, but what we

11:33    1    focused on was the intent, was the attempt to defraud, and

2    that's where -- it was the government's position that the mere

3    application was the attempt to defraud, and certainly that's

4    applicable in the guidelines.

5    Q.  Certainly.  And you've been here today, you know that

6    Mr. Williamson pled guilty and he's here to take responsibility

7    for his actions, correct?

8    A.  Yes, sir.

9    Q.  And that his main goal in this sentencing hearing is to

10    point the Court to a different alternative way to calculate

11    loss and you heard that's what our testimony was about today,

12    correct?

13    A.  That's your position.  I think that maybe the goal overall

14    is to have a fair sentence.

15        MR. ERVIN:  Thank you very much, Agent Grosse.  No

16    further questions.

17        THE COURT:  Thank you.

18        Anything further?

19      (No response.)

20        THE COURT:  Thank you.  You can step down and be

21    excused, if necessary.  Okay.

22        MR. MAY:  Your Honor, the government would move to

23    remove acceptance of responsibility.  I believe that

24    Mr. Williamson numerous times did not answer the Court's

25    questions, was evasive, and in fact would not say that he did

11:34   1    anything wrong.  He said such statements as it would be better

2    judgment or I should have used more discretion, when in fact

3    the testimony that was just presented showed that he lied and

4    knowingly submitted false applications.

5            Your Honor, I think that through the numerous

6    examples, be it the mortgages, be it John Fitzgerald

7    Kennedy [sic], be it Margaret Sherlock, be it Mary Gorman

8    Carroll, or Courtney Carroll's three fathers, I think the

9    evidence is clear that Mr. Williamson did not just use a lack

10   of judgment, but the reason why he pled guilty is because he is

11   guilty, he knowingly and intentionally entered into a

12   fraudulent scheme, which was to defraud life insurance

13   companies.

14           Your Honor, I'm happy to address additional things,

15   but I think the first issue is, I don't believe he -- I think

16   he has gone back and he has not accepted responsibility as far

17   as what he did, especially when the Court, and through the

18   Court's discussion with him, he never said, yes, what I did is

19   wrong.  I should have used better judgment.  When in fact

20   there's evidence of a quick -- a quick calculation of

21   approximately 120 life insurance applications which are

22   fraudulent beyond a doubt, be it the mortgages, be it these

23   individuals, be it the women with the income.

24           So, Your Honor, I just take exception to the fact that

25   we're not -- he's not here talking about alternative loss, he's

11:36  1    saying that he didn't do anything wrong, which I don't believe

2    the facts of this case show.

3              THE COURT:  Okay.  And then if you can answer the

4    other question about the actual losses, just to have an

5    argument against --

6              MR. MAY:  And Your Honor, that was --

7              THE COURT:  -- those counts, if you will.

8              MR. MAY:  -- something that we did not look at.

9              THE COURT:  Okay.

10             MR. MAY:  Unless the insurance companies came to us,

11   right?  Because it is the -- well, let's make sure we

12   understand that Mr. Williamson is an agent of the life

13   insurance companies.  He's not an agent of the Travelers,

14   right?  He exchanged roles here.  He became an agent of the

15   Travelers.  He pushed through information that he knew was

16   fraudulent.  And the testimony, I think, supports the fact that

17   he actually made up some of this information in order to try to

18   get policies issued.  So when he becomes an agent of the

19   Travelers as opposed to what he was employed to do, what he

20   took money to do, he has committed wholesale fraud.

21             Your Honor, I think that Special Agent Grosse

22   characterized as well, he is the gatekeeper, he is the person

23   on the front lines, he is the person who knows these people, he

24   is the person who is invited into their community to write

25   these policies, and he is the person who owed a duty to his

11:37    1   employer not to defraud them, but to ensure that they are not

2   defrauded.  Any agency principal would stand for that.

3       So as far as his role in this, he was an active

4   participant who made money.  He made a living on fraud.  Did he

5   make as much as some others?  No.  That's what the

6   government -- you know, that's what we said during our 3553(a)

7   analysis, right?  That was something that weighed in his factor

8   had he accepted responsibility.

9       But what I think is clear is that he has no respect

10   for the law.  What is clear is that he has not accepted

11   responsibility for his actions, but he wants to minimize it for

12   the Court in an effort to try to, you know, distance himself

13   from the very facts of what he did.

14       There were statements such as he fell into a trap of

15   criminality.  No, he actively participated.  He fell into a

16   scheme.  At least with the mortgage fraud, from the testimony

17   he created that scheme.  Do I believe or does the evidence of

18   the investigation show that he came up with the life insurance,

19   quote-unquote, game as the Travelers call it?  No, he did not.

20   That -- we do not have any evidence that he was the creator.  I

21   believe the evidence would show that Tony Mercier was.  He is

22   deceased now.  However, testimony that just came to the Court

23   was that he was the creator of the mortgage fraud aspect of the

24   scheme.

25       Now, Your Honor, we were trying to be magnanimous,

11:39  1    trying to work with the defense, trying to make this a fair,

2    just, and easy process.  As the Court heard, we could have

3    easily proved up more information, but it didn't make a

4    difference from the guidelines.  The guidelines are what the

5    guidelines are, and so therefore it doesn't matter if the loss

6    amount is 9.5 or 24.5, the guidelines still come out at a

7    guideline level of 60.

8         Your Honor, I would just redo the 3553(a) factors very

9    briefly considering the representations by Mr. Williamson.  I

10   believe that when he comes in here, he is continually --

11   continuing to misstate what he did, which I believe goes

12   against any sort of -- any sort of acceptance of

13   responsibility.  I believe it goes to show that he is embedded

14   in the fraud.

15        And the nature and the circumstances of the fraud

16   become that much more apparent, that he won't even say, well,

17   there was this one time I should have used better judgment.

18   No.  The testimony was over 115 policies are, on their face,

19   fraudulent by the actions of this man.  So taking that into

20   consideration.

21        I also think it goes that there is no respect for the

22   law.  He lied in front of the grand jury.  He is held

23   responsible for that.  He did not contest that in the

24   presentence report.  I believe those lies continue today

25   through the questioning of the Court.

11:40

1    Your Honor, we'd ask for a guideline sentence.  I
2 think it is appropriate.  The defense is absolutely right, we
3 do not have a firm number as far as actual loss because what he
4 did -- what he did is he set up a system for $54 million to be
5 paid out to the Traveler community.  Of that, we agree that a
6 significant portion of it, and he agrees, a significant portion
7 of it was fraudulent.  You've heard testimony of 100-plus
8 policies were fraudulent on their face.  So at least a quarter
9 of the policies that he issued or caused to be sent to life
10 insurance companies, once he does that, he's already said it is
11 out of his hands.  Once it's out of his hands, it should not
12 matter what occurs after that, right?  His fraudulent
13 involvement has ceased at that point because, again, he is the
14 gatekeeper.
15    And to say that the life insurance companies should
16 have done better, they're not on the ground, he is.  They're
17 not talking to people, he is.  They're not coming up with the
18 lies, he is.
19    Your Honor, for those reasons, that's the reason why
20 he pled guilty, because had he gone to trial it would have been
21 infinitely worse.  Mr. Ervin did a great job getting him here
22 and getting him pled because he saved him ten years.  He did
23 his job and fronted -- Mr. Williamson just hurt himself today
24 when he couldn't even answer the Court's most basic questions
25 of:  What did you do wrong?

11:42    1          Well, I should have used better judgment.

2          No, he shouldn't have lied.  I'm happy to answer any

3    other questions the Court may have.

4          THE COURT:  That's sufficient.

5          Mr. Ervin, anything further?

6          MR. ERVIN:  Yes, ma'am, briefly, Your Honor.  Judge, I

7    think procedurally and legally, it's axiomatic that

8    Mr. Williamson has taken responsibility for his actions.  He

9    pled guilty in front of you, said he was guilty, and he's here

10   today simply asking for mercy.  To say that he's trying to

11   minimize his involvement is misstating what's actually going on

12   here.  He's asking Your Honor to consider the other factors

13   that are involved in this case that involve many other people

14   who are career criminals who took advantage of every

15   opportunity to get involved in this scheme.  He's not saying he

16   didn't do any of this.  That's not what he said.  He said,

17   Judge, please have mercy on me today.  I'm taking

18   responsibility.  You can send me to prison.  Please consider

19   alternatives.  Please consider a lighter sentence.

20          And if his presentation and his answers to your

21   questions were not well rehearsed, well, let's be clear:  This

22   is the first time he's ever been in a stage like this.  He's

23   never been in a courtroom begging a judge to not put him in

24   prison other than a DUI, which is a traffic offense.  I've

25   handled hundreds of DUIs and I have yet to have someone go to

11:43

1    jail on a DUI, first offense.  So realistically, this is the

2    first time he has ever been in a courtroom like this talking

3    about these kinds of consequences and begging Your Honor not to

4    put him in prison.

5         He's got a lifelong track record of philanthropy,

6    family man, Christian values.  This scheme, to say he fell

7    through the cracks into an illegal scheme, well, let's be

8    clear:  I mean, it could have been any insurance agent that had

9    the lack of scruples at the time for these people to take

10   advantage of him and him to take advantage of the situation.

11   He's here to say he took advantage of the situation and he has

12   pled guilty and he has taken responsibility.

13        Again, this is the first time he's ever been in a

14   stage like this and had to talk in this setting, so his

15   presentation was -- you know, may have left some things to be

16   desired, but nonetheless, his presence here today means he's

17   taken responsibility.

18        Mr. May does a great job of what he's done, he's

19   argued this case a dozen times, so certainly his aggressive

20   attack on my client is certainly going to be seen as well

21   versed and rehearsed.  I understand his job and I can

22   understand why he wants to see more from Mr. Williamson, but

23   I'll be honest with you, Judge, Mr. Williamson is scared.  He

24   sits here hoping that you will understand the good parts of his

25   life in mitigation.

11:44    1          The fact that he withdrew all of his objections and

2    came to terms with the factors in the presentencing report is

3    taking responsibility for his actions.  He didn't come in here

4    and make the government prove 100 and so many policies.  No, he

5    withdrew the objection and asked Your Honor to consider

6    alternative means of loss calculation, which the law clearly

7    allows, and there is precedence for greatly reduced sentencing

8    deviating from the guidelines.

9          So I'd like for you to consider everything we've put

10    forward today and understand that we've, at no point, denied

11    responsibility.  Not once.  Now, his presentation, I will say,

12    maybe could have been rehearsed a little better, Judge, but

13    he's intimidated, he's scared, and he's asking you for some

14    mercy here today.  I believe that covers that issue.

15          With regards to the actual loss, Judge, I am simply

16    going by the guidelines and its directives to say there is

17    ample precedence for you to deviate from the guidelines when

18    you have a case where actual loss is greatly different, huge,

19    vast difference of intended loss versus actual loss and gain.

20    The numbers are so largely different that I think it warrants a

21    reasonable account of other factors.  Thank you, Judge.

22          THE COURT:  Thank you.

23          MR. MAY:  Briefly.  Christian values, thou shalt not

24    lie, show shalt not steal, he did those in abundance.

25          He says this is the first time he's ever been in a

11:46

situation like this.  Well, it's not the first time he's ever
had to tell the truth.  He failed today and he failed before.
Again, we aggressively attack lies, that's what we do.  That's
the reason why he's here.  That's the reason why he's being
prosecuted.  And when he -- when the Court asks him a direct
question, it's not enough to say you accept responsibility.
What did you do?  And he still obfuscated what he did.  He
still wouldn't say.  He made up a story about Mary Cat Carroll.
He made up the stories about the mortgages which were correctly
refuted.

Your Honor, a guideline sentence fulfills all 3553(a)
factors and in fact is warranted, and I would strongly say is
mandated considering not only what he did then, but what he did
today.

THE COURT:  Thank you.  All right.  You can remain
seated, because I'll just have a few comments before I actually
pronounce sentence and I'll let defendant know when he should
stand.

Mr. Wade is before the Court for purposes of
sentencing having pled guilty to conspiracy to commit mail and
wire fraud.  In this investigation he was identified as a
participant in a conspiracy involving unlawful activities for
the purpose of defrauding life insurance companies and then
also with respect to life insurance dealing with mortgages.

His position was as an insurance agent throughout this

11:53   1   time, and he is alleged to have knowingly submitted materially

2   false information, including but not limited to insurable

3   interest, mortgage information, status, or existence of other

4   policies, employment, income, and net worth of the insured on

5   life insurance applications in order to fraudulently obtain

6   life insurance policies for members of the Irish Traveler

7   community.

8           Once these life insurances policies were issued,

9   Mr. Williamson received financial compensation in the form of

10   commissions that were paid for securing these policies.

11           Mr. Williamson has only one prior conviction, which is

12   for driving under the influence of alcohol.  He is 55 years

13   old, married, and has two children from a previous marriage.

14   He resides in Thomson, Georgia.  He's reported to be in fair

15   health, but does suffer certain health conditions and does take

16   some medication to support those health conditions.

17           He has indicated through his investigation he has no

18   history of mental or emotional problems.  He has not reported

19   any history or current use of illegal drugs.  He has had some

20   social drinks with alcohol.  He's received a high school

21   diploma from Thomson High School.  He's attended classes at

22   several colleges, but still has not met the requirements for a

23   college degree.

24           He has sold insurance for the past 15 years and

25   previously owned his own landscape maintenance company and

11:54   1    worked in banking and the manufactured housing business.

        2            I did accept his plea and then today asked him further

        3    questions to make sure that he understood what he was before

        4    the Court for.

        5            With respect to the government's challenge on

        6    acceptance of responsibility, while I do believe that

        7    Mr. Williamson does not admit all of the information today that

        8    the agent has, and he's really bordering close to me being able

        9    to not accept responsibility, at least at my questioning he did

       10    admit that the information that he received, he knew that

       11    certain categories of the information, for example, mobile

       12    homes, would not have appraised at, you know, the lots that

       13    they were, and that such information would have been false and

       14    that there might have been certain beneficiaries that he knew

       15    could not have been insured interest.

       16            So for purposes of the plea, because it only takes

       17    essentially the one act in concert with someone else to

       18    actually get to the conspiracy count, then I will let the plea

       19    stand and the acceptance of responsibility, but I will consider

       20    his comments to me with respect to the sentencing.

       21            Now, with respect to the sentencing, while

       22    Mr. Williamson has discussed that his actual loss was

       23    approximately $40,000 in commissions, but that the parties have

       24    agreed to an intended loss range of 3.5 to 9.5 million, down

       25    from what the agent has testified to in excess of perhaps

11:54   1   50 million, and that the case law does allow for a variance if
2   the actual loss broadly disputes the intended loss, I do
3   believe that while there was an agreement, based on Agent
4   Grosse's testimony it could have supported, in addition to the
5   discovery in this case, well more than what the parties agreed
6   upon, but I do understand, having been the judge for several
7   sets of these cases, that the government, in utilizing its
8   resources, goes so far, and has gone extremely far,
9   particularly in this case, in terms of what it needed to prove,
10   and that we can accept that proof to extrapolate, you know,
11   many other things in the case, in that there wasn't going to be
12   necessarily a need to bring me forth every single application,
13   let me know every date of death and every payout, and then put
14   it to the range of where he was.

15           The bigger issue here is that Mr. Williamson has broad
16   experience in the insurance industry.  The Court nor the
17   government is suggesting that over the course of his life that
18   all the applications he did were fraudulent.  We are here about
19   this particular case with respect to Murphy's Village.
20   However, I can consider a person as they are, and with that
21   broad insurance experience, then I believe that Mr. Williamson,
22   as is indicated in his guideline calculation where he got an
23   enhancement for abusing a position of trust and having more
24   experience, that he knew the difference between what was
25   required on the applications and what information was needed,

11:55    1    and in many instances he relaxed those requirements or, quite

2    frankly, just avoided checking out the credentials on the

3    application.

4         Agent Grosse testified, who has had broad experience

5    in the FBI, and then he gave very credible testimony,

6    particularly to a consistent scheme.  It's not just the mere

7    fact of the Travelers, who have their issues because they were

8    before the Court criminally, and of course the government even

9    then did not investigate everybody who is perhaps involved over

10    there, but did do enough sufficiently to essentially shake up

11    the community and try to detect the fraud in that particular

12    area, that the agent narrowed down to show, particularly in the

13    area of the mortgage fraud, that certain incidents were very

14    peculiar to Mr. Williamson as the agent with respect to not

15    detecting or relaxing the requirements or essentially avoiding

16    the requirements for who was the insured, whether a driver's

17    license was needed, whether with respect to the particular --

18    appraise-ability of particular property and things of that

19    nature, that he should have even accepted such information.  So

20    he was clearly involved in accepting fraudulent information.

21         There were also other coconspirators in the case,

22    obviously the Travelers themselves, and yes, they are a

23    community who has engaged in substantial fraud, but even then,

24    a person has to be held for their own accountability in how

25    they accept the information, and to the extent they have that

11:55

1   knowledge, it's still up to their duty to avoid that

2   information.

3        With respect to the comments about whether

4   Mr. Williamson was well rehearsed, you don't have to be well

5   rehearsed just to tell the truth, and I asked him a lot of

6   information because I did feel like he was somewhat backing out

7   or discussing what he had discretion on and kind of pushing

8   things forward, but he was to act responsibly and

9   professionally in line with the conduct of responsibility in

10   his line of business and not just merely accepting information

11   at face value.  So he did set up a system that, in many

12   instances, net out payments on the policies in addition to his

13   commissions, and those payments have led to more fraudulent

14   activity.  And so the concern is that when you do any type of

15   illegal activity, you would be responsible for the proximate

16   causes of what would lead in that regard for that illegal

17   activity.

18        So, Mr. Williamson, if you would please stand for

19   sentencing.  Having calculated and considered the advisory

20   sentencing guidelines and having also considered the relevant

21   statutory sentencing factors contained in 18 U.S.C. Section

22   3553(a), it is the judgment of the Court that the defendant,

23   Douglas Wade Williamson, is hereby committed to the custody of

24   the Bureau of Prisons to be imprisoned for a term of 60 months.

25        Should the government need any additional information

11:56    1    with respect to the restitution, we've held that open for 30

2    days.  It appears the defendant does not have the ability to

3    pay a fine, therefore, the fine is waived, but he will pay the

4    mandatory $100 special assessment fee.

5            With respect to a term of supervised release, that

6    shall begin after your period of imprisonment and that will be

7    for two years.  You'll need to report to the Bureau of

8    Prisons -- report within 72 hours of your release from the

9    Bureau of Prisons to the probation office in the district to

10    which you are released.

11            While you are on supervised release, you will comply

12    with mandatory and standard conditions of supervision as

13    outlined in 18 U.S.C. Section 3563(a) and (b), and you'll

14    comply with the following special conditions:

15            You cannot open any additional lines of credit, you

16    have to provide the probation office with any information they

17    request regarding your income tax returns, bank statements, or

18    any financial statements or other financial information.

19            If an amount of restitution is ordered, then you'll

20    pay it at a minimum monthly installment of $100 and that will

21    commence 30 days after the imposition of the sentence.

22            You have pled pursuant to a plea agreement, which the

23    Court has adopted, and it agrees to waive the right to contest

24    either the conviction or the sentence, but it does not waive

25    prosecutorial misconduct, ineffective assistance of counsel, or

11:58    1    changes in the law.

2              If you wish to appeal, then you'll need to do so

3    timely through your lawyer or on your own, but either one of

4    you would be held to the relevant time periods in the Rules of

5    Criminal Procedure or any relevant sentencing statutes.  Do you

6    understand your right to appeal and the timeliness?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Any objection to the form of the sentence?

9              MR. MAY:  No, Your Honor.

10             THE COURT:  I find it sufficient but not greater than

11   necessary to achieve the sentencing factors herein.

12             MR. MAY:  The government would move to dismiss the

13   remaining counts of the indictment.

14             THE COURT:  Motion granted.

15             MR. MAY:  We will then also within 30 days query the

16   life insurance companies to ensure there's no restitution.  If

17   we do not hear back from them, then we will file the

18   appropriate paperwork to close this matter.  If there is a

19   response, we will alert Mr. Ervin and we will try to see if we

20   can come to a resolution without the Court.  If not, we'll have

21   a hearing.

22             THE COURT:  Okay.  Thank you.

23             MR. ERVIN:  Your Honor, the final thing would be any

24   time to report, as much time as Your Honor would allow, six

25   months if possible, and then any facility, to have the

11:59    1    appropriate health care facility to be able to address his

2    health care needs.

3              THE COURT:  Okay.

4        (Off-the-record discussion between counsel.)

5              MR. ERVIN:  Your Honor, June 1st would be a date of

6    potential reporting as opposing counsel has suggested.  I would

7    not object to that.

8              THE COURT:  All right.  Not report before June 1st and

9    then recommend a health care facility, and I believe that would

10    be Butner.

11              MR. MAY:  Probably.

12              THE COURT:  All right.  Thank you.

13              MR. MAY:  Thank you.

14              MR. ERVIN:  Thank you, Judge.

15        (Proceedings concluded at 12:00 p.m.)

16                        *   *   *   *   *

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES OF AMERICA                    )
                                                 ) ss:
2    DISTRICT OF SOUTH CAROLINA                  )

3

4                    C E R T I F I C A T E

5         I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    District of South Carolina, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 7th day of December, 2018, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12        I further certify that this transcript contains

13   pages 1 - 80.

14        IN WITNESS WHEREOF, I have hereunto set my hand at

15   Columbia, South Carolina, this 7th day of February, 2019.

16

17

18                    /s/ Carly Horenkamp

                      Carly L. Horenkamp, RDR, CRR, CRC
19                    Certified Shorthand Reporter

20

21

22

23

24

25
```